Filed 7/8/19 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TANNER JOSEPH POLK,<br><br>        Defendant and Appellant. | E069641<br><br>(Super.Ct.No. RIF1603909)<br><br>ORDER MODIFYING OPINION; AND DENIAL OF PETITION FOR REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

The petition for rehearing filed by appellant on June 28, 2019, is denied.  The opinion filed in this matter on June 14, 2019, is modified as follows:

On page No. 2, the first paragraph, the word "cell" is changed to "area."

On page No. 5, subheading "B," the word "CELL" is changed to "AREA."

On page No. 5, the first paragraph under subheading "B," the fourth sentence, remove the words "in any of the cells."

On page No. 5, the first paragraph under subheading "B," the fifth sentence, the word "cell" is changed to "area."

1

On page No. 10, the first full sentence, the word "cell" is changed to "area."

On page 10, the second full sentence, the word "cell" is changed to "area."

On page 16, the first full paragraph, the third sentence, the word "cell" is changed to "bunk."

In the concurrence, on page 1, section "I," the first sentence, the word "cell" is changed to "area."

Except for these modifications, the opinion remains unchanged.  The modifications do not effect a change in the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

MILLER _____
                                                            J.


We concur:

McKINSTER _____
                    Acting P. J.


RAPHAEL _____
                              J.

Filed 6/14/19 (unmodified opinion)
See concurring opinion.

CERTIFIED FOR PARTIAL PUBLICATION[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E069641 |
| v. | (Super.Ct.No. RIF1603909) |
| TANNER JOSEPH POLK, | OPINION |
|     Defendant and Appellant. | |


APPEAL from the Superior Court of Riverside County. Daniel A. Ottolia, Judge. Affirmed.

Arielle N. Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of subsections sections D and E in the Discussion.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Tanner Joseph Polk, an inmate at the California Rehabilitation Center in Norco, was found in his cell with eight small pieces of cut-up and numbered paper, along with a greeting card. A correctional officer touched the paper and some of it had a grainy feel. The correctional officer had learned from other prison officers during routine training that a current trend in the prisons was the possession of methamphetamine-infused paper. He did a preliminary test at the prison and discovered the presence of methamphetamine on one piece of paper and on a small corner of the greeting card. The paper was tested at a laboratory, and some of the papers were found to contain methamphetamine; the remainder of the greeting card tested negative.

Defendant was found guilty of possession of methamphetamine while in prison. (Pen. Code, § 4573.6.)[1] Defendant admitted he had suffered one prior serious or violent felony conviction (§§ 667, subds. (c), (e)(1), 1170.12, subd. (c)(1)). Defendant was sentenced to six years in state prison.

Defendant makes the following claims on appeal: (1) insufficient evidence was presented to support that he possessed a usable amount of methamphetamine and he had knowledge that it was methamphetamine, to support his conviction of violating section 4573.6; (2) the correctional officer should not have been allowed to testify as to whether

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

the papers contained a usable amount of narcotics as his testimony was speculative and lacked foundation; (3) the trial court deprived defendant of a right to present a defense by refusing to allow him to properly address the quantity of methamphetamine found on the papers; (4) cumulative errors warrant dismissal; and (5) the trial court erred by denying his *Romero*[2] motion to dismiss his prior strike conviction. We affirm.

**FACTUAL AND PROCEDURAL HISTORY**

A. <u>OFFICER CARRION'S BACKGROUND AND EXPERIENCE</u>

California Department of Corrections and Rehabilitation Correctional Officer Anthony Carrion was assigned to the investigative services unit at the California Rehabilitation Center in Norco (CRC). Defendant was an inmate at CRC. Officer Carrion had been with the investigative services unit for eight months as of April 26, 2016. Prior to being assigned to the investigative services unit, he was a search and escort officer for six years, a yard officer for three years, and a dorm officer for one year. He had been with the Department of Corrections and Rehabilitation for more than 11 years. Prior to working at CRC, he attended a 16-week training academy, where he was taught how to search cells and inmates. Each year he attended a week-long refresher course. The training included the recognition of narcotics. Specifically, for methamphetamine, he was trained to look for a crystal material similar to table salt.

Officer Carrion was trained on different methods of usage of methamphetamine. It commonly was snorted, smoked or taken intravenously. He explained he had been

---

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

3

advised that a current trend was methamphetamine-infused paper.  The methamphetamine was dissolved in water and paper was soaked in the water.  The paper would then be dried and cut into pieces.  A user would put the paper under the tongue and it would dissolve into the bloodstream.

Officer Carrion explained that when he was a dorm officer, he had been involved in searching each inmate's cell; these searches occurred five times each day.  Inmates usually had a lookout who alerted the other inmates by yelling, "walking."  Once this occurred, he paid particular attention to how inmates reacted when he was approaching the cells.  If there was an alert, he was aware that something was going on in the dorm.  If Carrion suspected an inmate had contraband, he would search the inmate from head to toe.  The cell was thoroughly searched for contraband, which could include narcotics, tattoo materials and any other unauthorized materials.

While he was a yard officer, Officer Carrion was involved in searching the yard before and after the inmates were in the yard.  He and the other officers would search for contraband, including narcotics.  Inmates were searched in the yard if they exhibited suspicious behavior.  As a search and escort officer, he would assist the assigned dorm officer in conducting searches of the cells.  Again, he and the dorm officer would look for inmates exhibiting suspicious behavior.  At all times during these searches, he was looking for contraband.  He conducted eight to 10 searches a day of inmates, cells and other facilities while a search and escort officer.

His current assignment with the investigative services unit involved conducting investigations of gangs and narcotics in the CRC.  For the investigation of narcotics, they

4

focused on inmates who had prior rule violations regarding narcotics and on any inmates who may be linked to narcotics coming into the facility. His assignment included the entire CRC. He could conduct a search in any part of the facility.

During his time at CRC, he had found methamphetamine more than 20 times. Narcotics were commonly brought into the prison during visitation; by lower-level inmates who worked outside the prison; and thrown over the fence into the facility. Officer Carrion had been taught about usable quantity of drugs in the academy. He had been taught it was not the amount that could get the person "high" but rather an amount that could be "manipulated."

B.     SEARCH OF DEFENDANT AND HIS CELL

Defendant was housed in dormitory 408. On April 26, 2016, a search was conducted by Officer Carrion in dormitory 408. He entered the walkway into the dorm area. No one sounded an alert and there was no suspicious movement in any of the cells. Carrion approached defendant's cell; defendant was sitting on his bunk facing away from him. Defendant was looking down toward his hand. Defendant turned and saw Carrion. He straightened up and had a look of "Oh, Shit" on his face; his eyes got wide. Defendant was ordered to his feet and told to put his hands on his head. Defendant was searched and nothing was found on his body.

Officer Carrion then searched defendant's bunk area. At this point, he observed there were several pieces of cut-up paper on defendant's bunk. There were five white, one blue and two yellow cut-up pieces of paper. In addition, a greeting card was found. Carrion had never seen pieces of paper cut up like the ones on defendant's bed, but had

5

been hearing through investigative service units at other prisons that there was a possibility of methamphetamine-infused paper being sent into prisons. He personally had not seen methamphetamine-infused paper.

He picked up the cut-up pieces of paper. They did not feel like ordinary paper. The paper he picked up felt grainy, like sand. He put the pieces of paper in an evidence bag. Officer Carrion also inspected a lined piece of paper, which was found underneath a greeting card. It did not have an unusual feel and he did not seize it as evidence. He next inspected the greeting card. In the bottom corner, the same substance as on the cut-up paper appeared to be present. No other items were seized from defendant's bunk area.

Officer Carrion took the items to his office. He tested one of the pieces of paper with a kit kept in the prison to give a preliminary determination of the presence of narcotics. He also tested a small corner of the greeting card. They both tested positive for methamphetamine. The remaining pieces of paper and the greeting card were sent to the California State Department of Justice for further testing.

Officer Carrion had heard that methamphetamine-infused paper was cut up in order to be disposed of, placed on the tongue or sold in small dosages. He opined that based on his education and experience dealing with methamphetamine in prison, the cut-up paper constituted a usable amount. He indicated that one piece of paper may have a high dosage and another a low dosage, but no matter the amount it definitely can be used.

Officer Carrion explained that the value of narcotics in prison was three times the value on the street. Carrion could not establish a value for the cut-up pieces of paper because it was the first time "we've actually had it."

6

On cross-examination, Officer Carrion admitted this case was the first where he actually encountered methamphetamine-infused paper. He was asked by the defense, "So the only thing that you're basing your experience or your assumption that people can actually use or get high off these meth-infused papers is what you've heard; that that correct?" Carrion responded, "Based off of the training of the officers, yes." He did not know the specific dosage in the cut-up papers. He also indicated the look of the paper was not unusual; it was only the feel. Carrion did not find any other pieces of paper among defendant's belongings that were suspicious like the ones found on defendant's bed.

On April 26, 2016, defendant was administered a drug test and it came back negative for methamphetamines.

C.      LABORATORY TESTING OF THE METHAMPHETAMINE

Irene Cabrera was a criminalist employed by the California State Department of Justice working in the Riverside laboratory. She had previously tested paper for the presence of controlled substances 10 to 20 times. When testing for a controlled substance on paper, she would record her observations of the paper then would weigh the paper. She would obtain the net weight, which would be the paper and whatever substance was contained in the paper. She initially tested the greeting card and two of the eight pieces of cut paper. She was then asked to test two more of the cut pieces of paper.

Cabrera tested four of the eight pieces of paper, which she randomly selected from the plastic bag. Cabrera was not offering any testimony on what was considered a usable amount of a controlled substance. Her laboratory only used the term "residual" amount

7

and not trace amount, which was anything under .01 grams. Substances less than .01 grams were not tested because it was unclear if there would be any remaining after testing. It was up to the court to order a test of these small amounts.

Cabrera explained that she could not put the paper into the Gas Chromatograph Mass Spectrometer (GCMS), which tested for the presence of narcotics. She took a part of one of the scraps of paper. She put it into some water and mixed it with a solvent and it changed into a gas. This gas was placed into the GCMS. The first scrap was designated 1-A. Its net weight—the paper and the substance—weighed .027 grams. For 1-A, she stated, "there was not enough sample present there for me to be able to confirm that methamphetamine was in that sample." The second scrap, 1-B, was weighed (paper and substance) and was .024 grams. It was tested and was positive for methamphetamine. A portion of the greeting card was tested and no controlled substances were detected. The third scrap, 1-C, which weighed .030 grams, and the fourth scrap, 1-D, which weighed .017 grams both tested positive for methamphetamine. The size of the pieces of paper was not part of her testimony.

Cabrera could only say that a controlled substance was present; she was unable to determine a percentage of methamphetamine to paper. She could not state, for example, that fifty percent of the weight was methamphetamine.

D.     DEFENSE CASE

Defendant presented the testimony of Erin Crabtrey. Crabtrey was a forensic toxicologist and laboratory director for Bio-Tox Laboratories in Riverside. She had a degree in chemistry and a master's degree in forensic science. Her laboratory was a

8

private testing facility that helped agencies such as the Riverside County Coroner's office. Her sole job as a toxicologist was drug analysis and interpretation. She primarily testified for the prosecution. Crabtrey had reviewed the reports prepared by Cabrera and Officer Carrion.

Her understanding of a usable amount of methamphetamine came from the National Highway Traffic Safety Administration. She also received additional information at meetings of the California Association of Toxicologists. Crabtrey stated that "usable amount" referred to a quantitative or numerical amount to determine whether or not you have enough of a particular substance to produce an effect.

Crabtrey indicated it was impossible to determine a usable amount from the scraps of paper. The results only showed the presence of methamphetamine and did not calculate how much methamphetamine was present in each of the four papers tested. Without a quantitative amount she would not be able to determine if there was a usable amount of methamphetamine in those samples. She had never tested methamphetamine-infused paper. She thought it was possible to quantify the actual amount of methamphetamine in the paper but that was not done in this case. She agreed that the scientific community did not define usable amount. She equated a dose with usable amount; there had to be enough of the drug to produce an effect.

Defendant testified on his own behalf. He admitted being convicted of a felony, for which he was serving a prison sentence. Defendant was sitting on his bunk the morning of April 26. Officer Carrion approached him, told defendant to put his hands on top of his head and to back away from his bunk; he was surprised because he had not

9

seen Carrion approach. He was not expecting Carrion to be in his cell. Carrion left his cell and did not tell him anything. Three hours later he returned and put handcuffs on defendant, advising they had found methamphetamine-infused paper on his bunk.

Defendant admitted he had the pieces of paper but they were in a binder above his bed. He insisted they were movie tickets for the movie shown at the prison on Friday nights. He got the tickets from another inmate. He also denied that the greeting card was on his bunk; it was stored in the bottom of his locker. Defendant denied he had knowledge that any of the paper he possessed contained methamphetamine. Defendant admitted he had used methamphetamine in the past, up to the time he went to prison.

Officer Carrion was recalled in rebuttal. He confirmed that movies were shown in the prison "game room" on Friday nights. Chairs were available for the inmates to sit in while they watched the movie. To his knowledge, there was no set seating arrangement and no numbers on the seats. He had never heard of a movie ticket plan. He did not recall a binder with additional papers being around defendant's bunk. Defendant never told him the pieces of paper were movie tickets.

## DISCUSSION

A.    INSUFFICIENT EVIDENCE

Defendant claims the evidence did not support the elements of a violation of section 4573.6, specifically that the cut-up paper in his possession contained a usable amount of methamphetamine, and there was insufficient evidence that he had knowledge of the substance on the paper. Based on our review of authority regarding usable amounts of controlled substances, and the circumstantial evidence and expert testimony

10

presented in this case, the evidence establishes that defendant possessed a usable quantity of methamphetamine.

In addressing a challenge to the sufficiency of the evidence supporting a conviction, the appellate court must determine "'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged.' " (*People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13, overruled on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93.)  In making this determination the court "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

"By definition, 'substantial evidence' requires evidence and not mere speculation. In any given case, one 'may *speculate* about any number of scenarios that may have occurred . . . .  A reasonable inference, however, "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.  [¶] . . .  A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Cluff* (2001) 87 Cal.App.4th 991, 1002.)

Possession under section 4573.6 requires that the state prove beyond a reasonable doubt the standard elements of possession found in the Health and Safety Code.  (*People v. Carrasco* (1981) 118 Cal.App.3d 936, 947-948.)  Thus, the elements for a section

11

4573.6 violation are (1) unlawfully exercising control over a controlled substance, (2) having knowledge of the substance's presence, (3) having knowledge of the substance's nature as a controlled substance, and (4) possessing the substance in an amount sufficient to be used as a controlled substance. (*Carrasco*, at p. 947, fn. 2.)

Here the jury was instructed in accordance with *Carrasco*. "Usable amount" was defined as "a quantity that is enough to be used by someone as a controlled substance. Useless traces are not usable amounts. On the other hand, a usable amount does not have to be enough in either amount or strength to effect the user."

The jury was also instructed, "The People allege that the defendant possessed the following items: At least three cut pieces of methamphetamine-infused paper. You may not find the defendant guilty unless all of you agree that the People have proved that the defendant possessed at least one of the items and you all agree on which item he possessed." We assume the jurors followed the instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) Based on the foregoing instruction, the jury had to determine that only one of the cut-up pieces of paper constituted a usable amount of methamphetamine.

A usable quantity of a controlled substance is shown if "it was of a quantity which could be potentiated by consumption in any of the manners customarily employed by users, rather than useless traces or debris of narcotic." (*People v. Piper* (1971) 19 Cal.App.3d 248, 2503333

The California Supreme Court in *People v. Leal* (1966) 64 Cal.2d 504, 512 held, "in penalizing a person who possesses a narcotic the Legislature proscribed possession of a substance that has a narcotic potential; it condemned the commodity that could be used

12

as such.  It did not refer to *useless* traces or residue of such substance.  Hence, the possession of a minute crystalline residue of narcotic useless for either sale or consumption . . . does not constitute sufficient evidence in itself to sustain a conviction.  Since in the present case the prosecution proved no more than defendant's possession of traces of narcotics and did not show that such residue was usable for sale or consumption," the matter was reversed.

In *People v. Rubacalba* (1993) 6 Cal.4th 62 (*Rubacalba*), the court responded to an argument that the crime of possession could not be proven unless the prosecution showed the controlled substance had a certain purity.  The Supreme Court held:  "the *Leal* usable-quantity rule prohibits conviction only when the substance possessed simply cannot be used, such as when it is a blackened residue or a useless trace.  It does not extend to a substance containing contraband, even if not pure, if the substance is in a form and quantity that can be used.  No particular purity or narcotic effect need be proven."  (*Id.* at p. 66; see also *People v. Karmelich* (1979) 92 Cal.App.3d 452, 456 ["The decision in *Leal* must be limited to such cases, where only a residue unusable for any purpose, is found; it does not extend to a case such as this . . . where the presence of heroin itself, not a mere blackened residue on a spoon, was discovered"].)

In this case, Officer Carrion found several cut-up pieces of paper, which had a grainy feel, and he had been trained in his 11 years working in the prison system that methamphetamine could look and feel like table salt.  It was evident to Carrion that these pieces of paper contained a substance, and preliminary tests showed that the paper

contained methamphetamine. This was not blackened residue or a useless trace as described in *Rubacalba* and *Leal.*

Officer Carrion further testified that it was in a form that could be used. He testified he had been recently trained that inmates were bringing methamphetamine-infused paper into prisons. He also testified that the methamphetamine present on the papers was a usable amount as it was used by placing the paper in the mouth and dissolving it under the tongue. This was the common method by which this paper was used. Despite never before seeing methamphetamine-infused paper, he recognized the methamphetamine based on the grainy feel of the paper. His suspicions were confirmed both by his own preliminary testing and by Cabrera's testing at the laboratory. This was sufficient to support that the small pieces of paper infused with methamphetamine were a usable quantity and not a useless trace or blackened residue.

It is true that there is no specific testimony as to the weight of the methamphetamine, only the weight of the three cut-up pieces of paper including the substance. However, a quantitative amount need not be proven. The case law only refers to useless traces or blackened residue, which was not the case here. (*People v. Karmelich*, *supra*, 92 Cal.App.3d at p. 456.)

The People refer to *People v. Carmical* (1968) 258 Cal.App.2d 103. In that case, officers found a balloon they believed to contain heroin in the defendant's pocket. Along with the balloon, the officers found milk sugar, which was commonly mixed with heroin. (*Id.* at pp. 105-106.) When the chemist tested the contents of the balloon, it tested positive for heroin but the amount was not specified. On appeal, the defendant argued it

14

was not shown a usable amount of heroin was in the balloon. (*Id.* at p. 107.) The appellate court noted that while only trace amounts of heroin may have been in the balloon, it was part of a large volume of material. One of the officers opined that the volume was sufficient to indicate it was possessed for purposes of sales. Further, milk sugar was commonly mixed with heroin in preparation for sale. This was sufficient to establish usable quantity. (*Id.* at pp. 107-108)

The People also refer to *People v. Camp* (1980) 104 Cal.App.3d 244, 249. In that case, the evidence established that a cigarette the defendant tried to abandon when he saw officers, "weighed .4 gram, was handrolled, made up of mint leaves 'laced with PCP' and that such a cigarette was sufficient to produce a narcotic effect on a person who takes as little as two puffs." (*Id.* at p. 248, fn. omitted.) The appellate court concluded this was sufficient to show a usable amount as no case had held that a chemical analysis of the substance sufficient to determine the weight or volume of the controlled substance was required. It also concluded, "It is immaterial whether the contraband is visually indistinguishable because it is mixed together with an inert substance of similar color and texture, or because, as a clear liquid, it adheres and dries onto the material to which it is fixed. In either case, the contraband was added to a substance for purpose of ingestion— its obvious intended use." (*Id.* at p. 249.)

In this case, as in *Carmical* and *Camp*, Officer Carrion testified that the pieces of paper felt grainy and did not feel normal. He also testified that the methamphetamine-laced paper was used by putting it in the mouth and eating it or sucking on it. Here, based on the feel of the paper and Carrion's experience, like in *Camp* and *Carmical*, were

15

sufficient to determine that the amount was usable regardless of its weight or separation from the material to which it was adhered. His testimony was sufficient to establish the pieces of paper infused with methamphetamine was a usable quantity.

Further, there was sufficient evidence to support that defendant had knowledge there was methamphetamine on the papers. Here, Officer Carrion had never seen methamphetamine-infused paper but found defendant in possession of several cut-up pieces, which he had been trained were used to ingest methamphetamine. When he approached defendant in his cell, defendant immediately looked up with an expression of "Oh Shit," indicating his knowledge of the presence of the controlled substance. Defendant did not immediately explain to Carrion that these were movie tickets and it was clear to Carrion after he felt these pieces of paper that they were not normal. Additionally, defendant admitted methamphetamine use prior to entering prison. This was sufficient to establish defendant's knowledge of the illegal substance.

While the evidence here is susceptible to an interpretation other than one supporting the elements of the charged offenses, that does not warrant reversal. (*People v. Catlin* (2001) 26 Cal.4th 81, 139.) *Rubacalba* and *Leal* both establish that a blackened residue and useless trace will not support a usable quantity finding. Here, the evidence established that there were three separate pieces of paper, which contained methamphetamine. A quantitative analysis establishing the purity of those substances was not required and Officer Carrion's testimony supported that there was a usable quantity. The circumstances reasonably justify the jury's conclusion that the elements of the crimes had been proven beyond a reasonable doubt.

16

B.     OFFICER TESTIMONY ON USABLE AMOUNT

Defendant contends the trial court erred by allowing Officer Carrion to testify that the amount of methamphetamine on the papers found was a usable amount.

1.     *ADDITIONAL FACTUAL BACKGROUND*

Prior to trial, defense counsel filed motions in limine to exclude testimony by the correctional officer as to whether the methamphetamine on the paper was a usable amount on the grounds of relevance and unduly prejudicial pursuant to Evidence Code section 352; lack of foundation; and speculation. It had not been shown that the correctional officer had the foundation to opine whether a piece of paper that tested positive for methamphetamine was a usable amount. The People filed opposition, that Officer Carrion had extensive training and experience in identifying controlled substances and was qualified to testify that defendant possessed a usable quantity of methamphetamine.

A hearing was held on the motions in limine. Defense counsel argued that the percentage of methamphetamine on the paper was not known from testing and the People had failed to lay a foundation that Officer Carrion was qualified to quantify the amount. The People responded it only needed to be shown that there was methamphetamine present, and not the quantity in relation to the paper. Carrion had extensive experience investigating methamphetamine use. The trial court ruled that it would allow the testimony of Carrion. It had been shown he had extensive training and experience, and defendant would have the opportunity to cross-examine him regarding his experience and his opinion.

17

2. *ANALYSIS*

"The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates. [Citations.] Such evidence is admissible even though it encompasses the ultimate issue in the case." (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371.)

Evidence Code section 801, subdivision (b) allows an expert to testify "Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

The determination that a witness qualifies as an expert and the decision to admit expert opinion testimony are within the discretion of the trial court and will not be disturbed without a showing of a "manifest abuse." (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1118; see also *People v. Mendoza* (2000) 24 Cal.4th 130, 177, superseded by statute on other grounds in *People v. Brooks* (2017) 3 Cal.5th 1.)

Officer Carrion had been working at the prison for over 11 years. He had been trained on the recognition of methamphetamine. He had found methamphetamine in the prison over 20 times. He also regularly attended training. He had received training that a new method of bringing methamphetamine into prison through the mail system was by

18

infusing methamphetamine into paper. It was cut up and placed in the mouth to dissolve. Based on Carrion's training and experience, he could testify that the cut-up pieces of paper felt like methamphetamine and were in a form commonly used to ingest the drug.

Defendant contends that Office Carrion had never before seen methamphetamine infused paper or observed anyone ingest the papers. As such, he should not have been allowed to testify as to usable quantity.

However, Officer Carrion had been a corrections officer for 11 years and had extensive knowledge as to the desire of inmates to smuggle contraband into the prisons. Following defendant's argument, Carrion could only testify to those items that he had personally witnessed smuggled into the prison facility or that he had witnessed an inmate use. That is not the law. Evidence Code section 801 allows an expert to rely on training and education in addition to personal experience. Carrion could properly rely on his training, which included discussions with other prison officers as to ways contraband was making its way into the prison system, and that methamphetamine-infused paper was used by placing it into one's mouth to dissolve. The trial court properly admitted Carrion's testimony regarding usable amount of methamphetamine.

C.    EXCLUSION OF DEFENSE ARGUMENT

Defendant insists the trial court prevented him during closing argument from properly addressing the quantity of methamphetamine found on the papers in an attempt to challenge whether the papers contained a usable amount. Defense counsel should have been allowed to comment on the lack of quantitative analysis of the methamphetamine though scientific testing.

### 1. *ADDITIONAL FACTUAL BACKGROUND*

The jury was instructed that a usable quantity is "a quantity that is enough to be used by someone as a controlled substance. Useless traces are not usable amounts. On the other hand, a usable amount does not have to be enough in either amount or strength to effect the user."

Defense counsel argued that manipulation was not the legal definition of usable amount. Defense counsel then put a slide up for the jury, which asked if the district attorney proved that the methamphetamine was a usable amount. Specifically, "That is, was the 'quantity' enough to be used by a person as a controlled substance."

Defense counsel then addressed Cabrera's testimony. First, she argued, "Nowhere in the CALCRIM will it say 'manipulate.' What it will say is whether there's a quantity and whether it's enough to be used by someone as a controlled substance, and by Ms. Cabrera's own testimony, she cannot quantify the methamphetamine in those papers." The People objected as improper argument and misstates the law. The objection was sustained but the motion to strike the statement was denied.

Defense counsel further argued "I think it's fair to characterize [Crabtrey] as a prosecution witness. However, even she had testified she cannot determine a usable amount in this case. That is, she cannot determine the quantity that is enough to be used by someone as a controlled substance. Why? Because you do not know the quantitative amount of the methamphetamines in this case." The People's objection on the ground of improper argument was sustained.

Defense counsel then argued, "Also, [Crabtrey] testified that even money sometimes or oftentimes tests positive for controlled substance because it passes through so many hands and touches so many surfaces. So what does that mean? That means that if we are going to say that here today that [defendant] is guilty of possessing a usable amount, without knowing the quantity of methamphetamine in those papers, that means each and every one of us here—" The prosecutor objected as improper argument and asked that the slide be removed." A chambers conference was conducted.

The prosecutor elaborated that the argument misstated the law. It was improper to imply to the jury that there had to be specific number attached to the methamphetamine in order to find a usable amount. The trial court agreed that the argument was improper. Quantity only meant that it had to be on the paper. It does not have to be numerically quantified. The argument was leading the jury to believe they had to come up with a number. Defense counsel disagreed with the trial court "wholeheartedly." It was not a misstatement of the law. The trial court responded, "I disagree. Take that slide off. You can use the "usable" language in the jury instruction. That's the only language you can use."

Defense counsel objected that defendant's Sixth Amendment rights to a fair trial and effective counsel were being violated. The prosecutor responded that defense counsel was arguing quantity meant "quantitative amount," which was improper. Defense counsel disagreed. The trial court understood the argument the same as the prosecutor. Defense counsel could not use "quantifiable amount."

21

2.     *ANALYSIS*

The Sixth Amendment right to counsel includes the "right to have counsel present closing argument to the trier of fact." (*People v. Marshall* (1996) 13 Cal.4th 799, 854; see also *Herring v. New York* (1975) 422 U.S. 853, 862 ["[F]or the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt"].) "Although counsel have 'broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law.'" (*People v. Mendoza* (2007) 42 Cal.4th 686, 702.)

Trial courts have broad discretion to limit closing arguments, including in criminal cases. (*People v. Herring*, *supra*, 422 U.S. at p. 862.) "The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He [or she] may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He [or she] may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." (*Ibid.*)

Here, the trial court interpreted defense counsel's argument to be that the People had to prove as an element of section 4573.6 a specific quantitative amount of methamphetamine was on the paper. As recognized by defendant, the People did not have to prove the purity of the methamphetamine or that it was capable of producing a narcotic effect. We cannot say the trial court abused its discretion by interpreting defendant's argument to be that a specific amount must be shown to be a usable amount. Even though defense counsel understood she was only arguing that the amount of

substance was a useless trace or residue, the trial court did not abuse its broad discretion in finding that the argument implied to the jury that it must determine the purity or numerical amount of the substance on the paper.

We further reject defendant's claim that his Sixth Amendment right to present "his strongest" defense was violated. Defendant was allowed to argue that Officer Carrion could not recognize methamphetamine-infused paper because he had not seen it before and had no idea how it was used. Further, defendant's expert Crabtrey testified, albeit relying on an improper standard from the National Highway Safety Administration, that in order to find a usable amount, a numerical amount was required to determine if enough of the particular substance was present to produce an effect. This was not the proper legal standard for a violation of section 4573.6 but defendant was allowed to present the evidence. Based on the foregoing, defendant was allowed to present his defense and his Sixth Amendment rights were not violated.

D.    CUMULATIVE ERROR

Defendant contends that the cumulative impact of the errors by the trial court in admitting Officer Carrion's testimony and restricting his closing argument rendered his defense "far less persuasive" and undermined confidence in the verdict. Initially, we found no error in the admission of Carrion's testimony or in the restriction of defense counsel's argument. "In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial. [Citation.] A predicate to a claim of cumulative error is a finding of error." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Here, there is no cumulative effect of multiple errors, the only

23

situation in which the cumulative error doctrine applies.  (*People v. Williams* (2013) 56 Cal.4th 165, 201, abrogated on other grounds in *People v. Elizalde* (2015) 61 Cal.4th 523; *Sedillo*, at p. 1068.)

### E.  *ROMERO* MOTION

Finally, defendant contends the trial court erred by refusing to strike his prior conviction.

Prior to sentencing, defendant filed a *Romero* motion to strike his prior conviction for violating section 288.5, continuous sexual abuse of a child.  He argued that the instant crime was a non-impact offense as it was unclear if the pieces of paper could actually be used.  Further, were he not incarcerated, his actions would constitute a misdemeanor.  Further, he acknowledged his prior crimes were a mistake but he had suffered abuse as a child, and from substance abuse.  His past decisions were mainly made due to his substance abuse.  Defendant was not a danger to society and fell outside the spirit of the Three Srikes law.  The trial court indicated it had read the *Romero* motion, the People's opposition[3] and intended to deny the motion.  The trial court asked if either party wished to be heard on the decision to deny the motion and defense counsel submitted.

A trial court has discretion to dismiss a strike prior under section 1385.  (*Romero*, *supra*, 13 Cal.4th at pp. 529-530.)  The trial court considers " 'whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the

---

[3]  The People's opposition is not part of the record on appeal.

24

defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

"[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 375.) "This standard is deferential . . . it asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts." (*People v. Williams* (1998) 17 Cal.4th 148, 162.)

"Because the circumstances must be 'extraordinary . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack' [citation], the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Carmony*, *supra*, 33 Cal.4th at p. 378.)

Here, defendant has failed to show the trial court's decision to refuse to strike his prior felony conviction was irrational and arbitrary. His prior criminal history between 1997 and 2003 involved theft convictions for which he was placed on probation. On August 12, 2013, he committed the prior conviction, a violation of section 288.5, subdivision (a), continuous sexual abuse of a child and was sentenced to six years in state prison. He had to register as a sex offender when he was released from prison. He was in prison on that offense when he committed the current offense.

25

While defendant's history revealed previous non-violent crimes, his strike conviction was for continuous sexual abuse of a child. While in prison, he committed the current offense, which the probation officer described as involving a high degree of planning and sophistication.. Even being in custody did not deter defendant from committing crime.

Defendant contends that the trial court misunderstood its discretion. However, defendant did not request that the trial court explain its determination that the *Romero* motion was to be denied. We presume the trial court understood and correctly applied the law in exercising its discretion and defendant has failed to meet his burden of affirmatively demonstrating error. (*People v. Mosley* (1997) 53 Cal.App.4th 489, 498-499.) The trial court did not abuse its discretion by declining to strike defendant's prior conviction.

**DISPOSITION**

The judgment is affirmed..

CERTIFIED FOR PARTIAL UBLICATION

MILLER _____
                                                                J.

We concur:

McKINSTER _____
                Acting P. J.

RAPHAEL _____
                    J.

26

RAPHAEL, J., Concurring.

Is there *any* quantity of a controlled substance that is too small to be a "usable quantity" under California law?

Our answer in today's opinion, at least in my view, is no. I join the opinion but write to explain this answer. Under our reading of existing law, the "usable quantity" element—counter to the ordinary meaning of those words—does not actually depend on the quantity of the drug in the defendant's possession. In this case, *any* measurable quantity of methamphetamine would suffice to support defendant's conviction; we hold that a small quantity of that drug here was sufficient, even though its precise amount was unknown and could be the smallest amount measurable by the laboratory. Under our reasoning, it is sufficient that *some* quantity of the drug was in a form suitable for consumption. Under the law as we find it, a drug is in a usable quantity simply if it—in whatever quantity—is possessed in a *form* that is typical for (or at least amenable to) controlled substance ingestion.

I

In his jail cell, defendant Tanner Joseph Polk possessed eight scraps of paper, four of which were lab-tested for the presence of methamphetamine. Three of those—weighing .017 grams, .024 grams, and .03 grams—tested positive.

But the lab could not determine the quantity of methamphetamine on each scrap. Thus, Polk's primary argument in this appeal is that the prosecution failed to prove an essential element of his drug possession crime: that he possessed a "usable quantity" of

1

the methamphetamine.  His argument has appeal based on the language of the element.  After all, if an *unknown* quantity of methamphetamine on three tiny scraps of paper is sufficient to show a "usable quantity" beyond a reasonable doubt, it is hard to see how any quantity could ever be too small.  We nevertheless hold that his argument fails under existing law.

A

Our Supreme Court has stated that an "essential element[]" of every drug possession case is that the defendant possessed a controlled substance "'in a quantity usable for consumption or sale.'"  (*People v. Martin* (2001) 25 Cal.4th 1180, 1184; *People v. Palaschak* (1995) 9 Cal.4th 1236, 1242).  Accordingly, under the official instruction that states the elements in most simple-possession drug cases, the jury is told that the prosecution must demonstrate that "[t]he controlled substance was in a usable amount."  (CALCRIM No. 2304.)  Likewise, our opinion today states that an element of the defendant's Penal Code section 4573.6 crime was that the drug was in an "amount sufficient to be used as a controlled substance."  (Maj. opn., *ante*, at p. 12.)

In most cases, the "usable quantity" element is uncontested.  Whatever else may be at issue in a drug case (for example, a defendant's knowledge of the drug's presence), enough of the substance typically is involved that the parties do not contest whether the quantity is usable.  Moreover, when little of the drug is present because the defendant has consumed it, the People can base the prosecution on the larger, ingested quantity (*People v. Palaschak*, *supra*, 9 Cal.4th at p. 1242), an argument not made in this case.

2

But in a relatively rare case involving merely a tiny quantity, when is an amount "unusable" and when is it "usable"? Juries are provided with language that governs such a determination. The caselaw quoted above states that a quantity of a controlled substance must be "usable for consumption." The standard jury instruction, this part of which was used here, likewise states: "A *usable amount* is a quantity that is enough to be used by someone as a controlled substance." (CALCRIM No. 2304.) Juries, including the one in this case, are told that a "useless trace" is not a "useable amount." (*Ibid.*).

Juries, however, are given no particular way to determine what differentiates a "useless trace" from a "usable amount." That is, if, say, 3 milligrams of methamphetamine is a usable amount, is 2 milligrams a useless trace? 1? Something even less?

There is only one plausible way that the law, or a jury, could make such a distinction based on quantity alone. And that is by reference to an amount that may have a narcotic effect on someone who is using the controlled substance, which is the reason why the substances are prohibited in the first place. In other words, it could be that amounts too tiny to affect a user are useless traces, and anything greater is an amount usable for consumption.

But this way of distinguishing useless from usable quantities is prohibited by our Supreme Court's law. Under *People v. Rubacalba* (1993) 6 Cal.4th 62, 66, "[n]o particular purity or narcotic effect need be proven" in a drug case. This proposition of law also is typically provided to juries, including the one here. (CALCRIM No. 2304.)

3

This *Rubacalba* rule eliminates any rational way of distinguishing a "useless" quantity of a controlled substance from a "usable" one. And it is the reason why, under our opinion today, even the smallest measurable amount of methamphetamine found on a piece of paper—which the amount on each scrap of paper in this case could have been— is sufficient to support a conviction. The import of *Rubacalba* on the "usable quantity" element is to ensure that no prosecution could ever fail on that element simply because the quantity prosecuted is too small. (See *People v. Mata* (1986) 180 Cal.App.3d 955, 959 [where prosecution is not required to prove that a controlled substance has an effect, "the quantity of PCP involved is not relevant in a prosecution for sale of the drug"].)

B

Although the usable quantity element does not actually preclude any prosecution based on quantity alone, it seems to me that that element has an application. Given the caselaw, the usable quantity element is actually about the *form* that the controlled substance is in, regardless of its precise quantity. In this regard, *Rubacalba*—the source of the "useless trace" term—stated that the "usable-quantity rule prohibits conviction only when the substance possessed simply cannot be used, such as when it is a blackened residue or a useless trace." (*People v. Rubacalba*, *supra*, 6 Cal.4th 62, 66.)

A blackened residue may come in a substantial *quantity*; but it is in a *form* in which no user ingests it. A "useless trace" may be read in the same manner. A dusting of a drug on a person's sweater; residue of cocaine on a piece of currency; a dog-detected odor of marijuana on a car's floor mat from an indiscernible remnant of the drug—these are examples of possession of a drug in a form that is unusable as a controlled substance.

4

(See *People v. Piper* (1971) 19 Cal.App.3d 248, 250 [prosecution's burden is to show that the drug "could be potentiated by consumption in any of the manners customarily employed by users"]; *People v. Camp* (1980) 104 Cal.App.3d 244, 249 [controlled substance of unknown quantity was mixed with another substance "for the purpose of ingestion"].)

Consequently, in my view, we are interpreting the caselaw's requirement of a "quantity usable for consumption" as a requirement of a "form useable for consumption."

II

Most other states reject the "usable quantity" element entirely. (See, e.g., *State v. Cheramie* (Ariz. 2008) 189 P.3d 374, 378 ["[a] 'usable quantity' is neither an element of the possession offense nor necessary to sustain a conviction for it."]; *Richardson v. People* (Colo. 2001) 25 P.3d 54, 58 ["possession of a usable quantity is not an element of the crime of possession"]; *State v. Rhode* (Idaho 1999) 988 P.2d 685, 687 ["Neither the evidentiary nor the statutory rationale for implementing the usable-quantity rule recommends the adoption of the usable-quantity rule by this Court"]; *State v. Brown* (Kan. 1989) 783 P.2d 1278, 1285 [joining "majority view" that any amount of a controlled substance can sustain a conviction].)

Our state's adoption of a usable quantity element creates the appearance of a substantial difference between the law in California and other jurisdictions. But today's opinion indicates that difference is not as great as it seems. Our state does not actually preclude a conviction merely because the quantity of a controlled substance is too small, which is why the small but indeterminate amount of methamphetamine sufficed to

5

support the conviction in this case. The law may preclude prosecution of a controlled substance in unusable form. But the reason why we uphold Polk's conviction is that he possessed a measurable amount of methamphetamine—whatever its actual quantity—in a form suitable for ingestion.

                                                    RAPHAEL
                                                                              J.