Filed 10/14/25  P. v. Mattingly CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ROGER WAYNE MATTINGLY,<br><br>        Defendant and Appellant. | A170673<br><br>(Lake County Super. Ct. No. CR969251) |

After a disagreement with his neighbor turned violent, Roger Wayne Mattingly was convicted of assault with a deadly weapon, simple assault, criminal threats, and drug possession. In this appeal, he argues that his trial counsel committed ineffective assistance of counsel by allowing a law enforcement officer to present improper character testimony, and that there was insufficient evidence that he possessed a usable amount of a controlled substance, as required for his drug possession conviction.  In addition, he contends, and the People agree, that he is entitled to resentencing because aggravating factors that should have been tried to a jury were tried by the court.  (See *People v. Wiley* (2025) 17 Cal.5th 1069, 1078-1086 (*Wiley*).)  We remand for resentencing but otherwise affirm the judgment.

1

## A.

Mattingly's convictions arose from an altercation he had with his neighbor, Daniel Current, Jr., in 2023. The confrontation involved a car that Current's son had purchased from one of Mattingly's former roommates while Mattingly was incarcerated. Mattingly found out after he was released from prison that his car, a BMW, had been sold, and he maintained that Current's son should return the car or compensate him for it.

The day of the altercation, Mattingly was walking by Current's house to return a machete that he had sharpened as a favor for another neighbor. He had the machete tucked under his arm, and he was also holding a concrete nail gun.

According to Current's testimony at trial, Current was returning home with his son from a nearby store. Mattingly was in front of Current's house, and Current's son went into the house as Current and Mattingly started talking. Mattingly demanded that Current pay him for the car and then threatened him, saying, " 'I'm going to shoot you.' " Current heard a clicking noise and believed that Mattingly had triggered something that looked like a pellet gun or nail gun. Current testified that he believed Mattingly was going to shoot him and feared for his safety. As a result, Current "attacked" Mattingly by shoving him. The nail gun fell out of Mattingly's hand, and Mattingly swung the machete at Current, who hit Mattingly a few times. Current realized that he was bleeding and tried to get the machete away from Mattingly. Mattingly ended up on the ground, and Current was able to put his foot on Mattingly's wrist, pinning the machete to the ground. Current described the machete as approximately 17 inches long.

Current had wounds on the knuckles and thumb of one hand, as well as on one leg. The sight of the blood made him feel

2

like he was going to pass out, so he screamed for his son, who was in the house.

Current's son testified that when he heard his father screaming, he came out of the house and saw Mattingly and Current on the ground. Mattingly had a blade in his hand and Current, who was unarmed, was bleeding. Current's son, also unarmed, then hit Mattingly on the head two or three times, using his hands. Mattingly went limp and Current was able to get away while his son yelled for Current's girlfriend, who was in the house, to call the police. Current's girlfriend did not see the altercation, but she heard the commotion and called the police. Current and Mattingly returned to their respective homes.

After the police spoke with Current, his son, and his girlfriend, they located Mattingly at his house. The police also found the machete inside his house.

Lake County Deputy Sheriff Demetrius Donaldson recorded his initial interview with Mattingly using his body worn camera; the video was played for the jury. As an interrogation tactic, Donaldson falsely told Mattingly that the altercation was recorded on a home security camera video that the police had reviewed. However, at the time of the interview, Donaldson did not know if such a video existed, and ultimately the police were unable to recover any video footage of the fight.

According to Mattingly's account in the body worn camera video, when he ran into Current, Mattingly commented on a new BMW that Current had acquired. Current then became "irate." Mattingly tried to walk away, but Current hit him repeatedly from behind. When Donaldson asked him why he swung the machete at Current, Mattingly asserted, "I was just trying to defend myself." Mattingly did not swing the machete "until after I was attacked and my back to was to him when I got hit." At some point Current's son came over and both he and Current "pummel[ed]" Mattingly.

3

Although Donaldson claimed during the interview that he "knew" from the security video that Mattingly started the fight with Current, Mattingly denied provoking the fight. Mattingly admitted to having a machete and an empty concrete nail gun with him, but he said he did not threaten to kill or shoot Current. Mattingly denied threatening Current even though Donaldson claimed his threat was caught on video.

Donaldson accused Mattingly of "telling [him] . . . lies of what happened." Donaldson added, "I've watched the video and I know you're bullshittin' me." When Mattingly said, "I'm not lyin' to ya," Donaldson responded: "You are bullshittin' me. You're lying to me." Despite Donaldson's claims that he knew from the security video that Mattingly was lying, Mattingly maintained that he did not threaten Current and that he only used the machete in self-defense, telling Donaldson "the video footage is wrong."

During the interview, Donaldson and Mattingly also alluded to Mattingly's prior police contacts. Mattingly explained to Donaldson that his car was sold while he was incarcerated on drug-related charges. Donaldson later noted that the two of them had "talked a bunch in the past," although Mattingly said he did not remember Donaldson. And in the course of denying that he committed a crime against Current, Mattingly commented, "I've been in enough trouble in my past."

According to Donaldson's testimony at trial, Mattingly appeared to be under the influence of methamphetamine or another stimulant drug at the time he encountered him. Mattingly had "quite a bit of blood on his left hand," and he had dried blood on his head.

In response to a question from the prosecutor about why he had misrepresented that there was a video, Donaldson testified: "It's a common -- or it's a sometimes-used tactic for subjects that you believe can be lying to you about [an] investigation especially

4

when they're off [from] the get-go, you know, making up excuses to what they're doing and what they have going on."

Donaldson also testified that when the police searched Mattingly's person in connection with his arrest, they found a glass vial containing a crystalline substance they recognized to be methamphetamine, along with a glass pipe commonly used to smoke methamphetamine. A criminalist testified for the prosecution that the vial contained .350 grams of methamphetamine.

**B.**

Based on the altercation with Current, Mattingly was charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); count one); battery resulting in the infliction of serious bodily injury (*id*., § 243, subd. (d); count two); criminal threats which would result in death and great bodily injury (*id*., § 422, subd. (a); count three); and misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count four). The information also contained special allegations as to the first three counts that Mattingly personally inflicted great bodily injury on the victim (Pen. Code, § 12022.7), and that Mattingly had seven prior felony convictions that rendered him ineligible for probation (*id*., § 1203, subd. (e)(4)).[1]

In addition, the information alleged several aggravating factors were applicable for sentencing purposes, including that Mattingly served a prior prison term; he "was convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed"; his "prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness"; and his "prior performance on probation, mandatory supervision, post-release community supervision, or parole was

[1] Undesignated statutory references are to the Penal Code.

5

unsatisfactory." (See Cal. Rules of Court, rule 4.421(a)(7), (b)(2)-(3), (b)(5).) The alleged aggravating circumstances also included two factors based on great bodily harm or great violence, and a factor based on the victim's particular vulnerability. (See *id*., rule 4.421(a)(1), (a)(3), (b)(1).)

The jury returned a guilty verdict on counts one, three, and four. With respect to count two, the jury found Mattingly not guilty of battery causing great bodily injury, but it found him guilty of the lesser included offense of simple assault. The jury found the allegation of great bodily injury untrue.

The trial court concluded that it followed from the jury's verdict that the aggravating circumstances based on great bodily injury or great violence were not present. In addition, the prosecution agreed not to pursue the aggravating factor based on the victim's vulnerability. The trial court concluded that the remaining aggravating factors were properly tried by the court, and not by the jury.

At the sentencing hearing, defense counsel argued that although Mattingly had a lengthy criminal record, "his record very rarely, if ever, extends [to] the areas of violence. A majority of his past related to property crimes, burglary, and so on, and possession charges as relates to his addiction to methamphetamine." Defense counsel also noted Mattingly's struggles with abuse as a child and with depression, describing him as someone who has "always existed on the edges" of society. Despite his challenges, trial counsel argued, Mattingly had "tried to better himself," as he went through prison and obtained an associate's degree.

With respect to aggravating factors, the trial court found that Mattingly had a "history of violence" and "numerous prior felony convictions . . . over the years" and his prior probation performance was "very poor." The court found no mitigating circumstances. The court then sentenced Mattingly to the upper

6

term of four years for count one, with shorter sentences on the remaining counts to run concurrently, resulting in an aggregate sentence of four years in prison.

## DISCUSSION

### A.

Mattingly argues that his trial counsel was ineffective because he failed to object when Deputy Sheriff Donaldson suggested that he was a liar and Current was truthful. On the present record, Mattingly is unable to establish that his attorney provided ineffective assistance.

Mattingly must show that his attorney's performance was deficient and that the error prejudiced his defense, depriving him of a fair trial. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687.) Ineffective assistance of counsel claims rarely succeed on direct appeal because the appellate record seldom reflects trial counsel's reasoning for an action or omission. (See *People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*).) In a direct appeal, the defendant must point to "affirmative evidence that counsel had ' " 'no rational tactical purpose' " ' " for the challenged action or omission. (*Ibid.*) Mattingly is unable to meet this burden on the record here.

### 1.

Donaldson provided the challenged testimony in response to a jury question about his decision to lie to Mattingly about the existence of a security video of the altercation. A juror posed the following question for Donaldson: "Since you are con[s]idered innocent [until proven guilty,] why did you lie about the [machete] attack to Mattingly[?] [¶] Why did you take [Current's] side of the story and [not] treat [Mattingly] in the same way[?]"

7

Based on this juror question, the prosecutor questioned Donaldson as follows: "Why did you lie to the defendant when you questioned him? Why did you tell him about that video?" Donaldson answered, "So I had previous law enforcement contacts with the defendant. I was familiar with his attitude, familiar with his behavior. We've been out there for some I would almost describe them as crazy calls sometimes with him, didn't result in anything else. However, I kind of knew what to expect coming into interview him. So when you go to interview a suspect[,] interview anyone related to a crime, you kind of pick a tactic to interview them with. That's the one I chose to go with. I didn't feel like he was going to be truthful with me from the getgo [*sic*] about his statements, you know, just based on his -- based on him being in his house and hiding instead of him calling 911. And then my previous encounters with him, I didn't think he was going to be truthful with me; so I chose that tactic."

The prosecutor then asked Donaldson, "did you use a similar tactic when you interviewed Mr. Current[?]" Donaldson answered, "I did not, no" because "[t]here w[ere] multiple witnesses there providing me with a very similar statement or basically the same chain of events that happened during the incident. And we didn't have a truthful basis that I was being provided the truth from that victim based not only by the victim but the persons involved in that altercation."

**2.**

We are unpersuaded by Mattingly's contention that his attorney could have had no strategic purpose in declining to object to Donaldson's response to the juror question.

First, defense counsel may have been concerned about offending the jury. Mattingly is correct that lay opinion testimony on another person's credibility is inadmissible for the purpose of establishing credibility. (See *People v. Melton* (1988) 44 Cal.3d 713, 744; *People v. Dryden* (2021) 60 Cal.App.5th 1007,

1026 (*Dryden*).) However, "an officer's testimony with respect to whether he believed a witness may be admitted to ' "assist[] the jury in understanding the actions of the police." ' " (*Dryden*, at p. 1027.) In the circumstances here, where the testimony was elicited in response to a question from the jury, Mattingly's counsel understandably may have been reluctant to object because the testimony was directly relevant to the jury's understanding of Donaldson's conduct, and objecting could have caused the jury to believe that the defense was standing in the way of the jury's truth-seeking function.

Second, defense counsel may have reasonably believed that the risk of objecting outweighed any potential benefit in part because Donaldson's response to the jury question was largely duplicative of other evidence that the jury had already heard. For example, Mattingly asserts that Donaldson's response to the juror question portrayed him as a liar. But by the time Donaldson provided the challenged testimony, the jury had already heard evidence that Donaldson thought Mattingly was lying—from the initial interview of Mattingly, when Donaldson repeatedly accused him of lying, and in Donaldson's unchallenged testimony explaining that he was using an interrogation tactic intended for suspects who are expected to lie. Allowing Donaldson to testify about the basis for his belief that Mattingly would lie may have enabled the defense to attempt to undercut his reasoning.

Third, Donaldson's response to the jury question potentially mitigated earlier evidence of Mattingly's police contacts by clarifying that the prior contacts with Donaldson "didn't result in anything else."

Fourth, Donaldson's response furthered the defense strategy, which sought to portray him as having conducted a one-sided investigation due to his personal bias against Mattingly. In his closing argument, Mattingly's attorney relied on Donaldson's

9

response to the juror question to argue that his investigation and testimony was tainted by bias. Defense counsel told the jury: "Remember, we talk about prejudice, prejudice of a witness. Remember, Deputy Donaldson gets up here and he says, oh, yeah, I've had plenty of encounters with him before. Prejudice, bias. That's why Deputy Donaldson led Daniel Current Jr. to say that he was in fear of his life -- prejudice, bias. I've had encounters with him before. I know exactly who he is. I know exactly who this man is. I'm going to string him up for assault with a deadly weapon." Mattingly's attorney then encouraged the jury to watch the video of Mattingly's interview, saying: "the cops show up and start asking him, lying to him, and what does he do? Does he crumble? Does he fold? Does he give contradictory statements? Nope. Not at all." In these circumstances, we are unable to rule out the possibility that defense counsel had a strategic basis for declining to object to Donaldson's testimony about his belief that Mattingly would not be truthful.

Mattingly also contends his trial counsel should have objected to Donaldson's response to the juror question because it "bolster[ed] the truthfulness of Current by having a law enforcement witness vouch for his veracity." But Donaldson's statement that "we didn't have a truthful basis that I was being provided the truth from that victim" was cryptic at best, and it did not intelligibly vouch for Current's credibility. And although Donaldson also stated that he had received similar accounts from multiple witnesses, defense counsel could have reasonably decided to take issue with that characterization separately, rather than object and risk making the jury think the defense was preventing the jury from hearing the whole truth. And indeed, in closing arguments, defense counsel addressed Donaldson's characterization of the witness statements by arguing to the jury that the other witnesses—Current's girlfriend

10

and son, who each witnessed only parts of the relevant events—
"didn't say too much."

On the record before us, Mattingly has not shown
affirmatively that his trial counsel lacked a rational tactical basis
for declining to object to Donaldson's response to the juror
question. (See *Mickel, supra,* 2 Cal.5th at p. 198.) As a result, he
is unable to show that his counsel's performance was
constitutionally deficient. (See *ibid.*)

**B.**

Mattingly next contends that his conviction for possession
of a controlled substance must be reversed due to insufficient
evidence that he had a usable amount of methamphetamine in
his possession. Examining the record for substantial evidence
(*People v. Polk* (2019) 36 Cal.App.5th 340, 348 (*Polk*)), we
disagree.

A conviction for possession of a controlled substance under
Health and Safety Code section 11377, subdivision (a), requires
possession of " 'a quantity usable for consumption or sale.' "
(*People v. Martin* (2001) 25 Cal.4th 1180, 1184.) This rule
"prohibits conviction only when the substance possessed simply
cannot be used, such as when it is a blackened residue or a
useless trace." (*People v. Rubacalba* (1993) 6 Cal.4th 62, 66
(*Rubacalba*).) To prove that the amount is usable for
consumption or sale, the prosecution need not prove that the
quantity is sufficient to produce a narcotic effect. (*Ibid.*)
Accordingly, the jury here was instructed that a "usable amount
is a quantity that is enough to be used by someone as a controlled
substance. Useless traces or debris are not usable amounts. On
the other hand, a usable amount does not have to be enough in
either amount or strength to affect the user." (CALCRIM No.
2304.)

11

At trial, Donaldson testified that the police recovered from Mattingly's pocket "a clear glass vial which contained a crystalline substance that we recognized as methamphetamine." The prosecution's criminalist testified that she determined that the weight of the methamphetamine was .350 grams, which she deemed a usable amount. On cross-examination, she explained that what she meant by a usable amount was that she had "enough sample to conduct an analysis and still have some left over." The criminalist added that the tests she performed consumed about .01 grams of the drug at most. She acknowledged that she could not opine on "whether someone can get high based on" the amount of methamphetamine recovered. On re-direct, the criminalist testified that the amount of methamphetamine recovered from Mattingly was an amount that could be manipulated and moved around. In addition to this witness testimony, the prosecution introduced a photograph of the vial found in Mattingly's pocket; the photograph showed a pipe next to a small, clear glass vial in which a white-colored substance was visible.

The record here contained substantial evidence that Mattingly possessed a usable quantity, or more than a "useless trace" or "residue" of methamphetamine. (*Rubacalba, supra*, 6 Cal.4th at p. 66.) The amount in question, .350 grams, was enough to move around and manipulate, and it was a sufficient quantity for the police to visually recognize the substance as methamphetamine. Further, the jury was also presented with the photograph depicting a white substance visible through the glass of the vial, alongside a pipe commonly used to smoke methamphetamine. The jury could reasonably infer from this evidence that Mattingly possessed a usable quantity of methamphetamine. (Cf. *People v. Karmelich* (1979) 92 Cal.App.3d 452, 455-456 [holding that evidence that balloons containing a substance that was at minimum .1 percent heroin, without more, was sufficient evidence that the substance was of

12

useable quantity because "the presence of heroin itself, not a mere blackened residue" was detected]).  Although the criminalist did not know whether the amount was sufficient for a user to "get high," the prosecution was not required to prove that the amount would have any effect on a user.  (See *Rubacalba*, at p. 66.)

## C.

Finally, the parties agree, as do we, that Mattingly is entitled to resentencing because two aggravating circumstances relied upon by the trial court should have been tried by a jury rather than the court.  Because Mattingly's entitlement to a jury trial raises a legal question, our review is de novo.  (See *People v. Superior Court (Frezier)* (2020) 54 Cal.App.5th 652, 659.)

Effective January 1, 2022, section 1170, subdivision (b), provides that, when a "statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term" unless "there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (§ 1170, subds. (b)(1)-(2); see Sen. Bill No. 567 (2021–2022 Reg. Sess.), Stats. 2021, ch. 731, § 1.3, eff. Jan. 1, 2022.)  Under section 1170, subdivision (b)(3), however, the trial court may nonetheless "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury."  Relying on section 1170, subdivision (b)(3), the trial court here tried two aggravating circumstances at issue in this appeal: whether Mattingly's prior convictions were numerous or of increasing seriousness, and whether his performance on probation was unsatisfactory.  (See Cal. Rules of Court, rule 4.421(b)(2), (b)(5).)  At the time of

13

sentencing, our Supreme Court had held that a defendant was not entitled to a jury trial on these aggravating factors. (See *People v. Towne* (2008) 44 Cal.4th 63, 81-82; *People v. Black* (2007) 41 Cal.4th 799, 820.)

Recently, however, our Supreme Court overruled those cases in *Wiley*, holding that the Fifth and Sixth Amendments to the United States Constitution, as well as section 1170, subdivision (b), entitle a defendant to a jury trial on the increasing seriousness of a defendant's prior convictions and the defendant's performance on probation. (See *Wiley*, *supra*, 17 Cal.5th at pp. 1078-1086; see also *People v. Wright* (2025) 113 Cal.App.5th 832, 847-848 (*Wright*) [holding that a jury must decide whether a defendant's past convictions are " 'numerous' "]; *Erlinger v. United States* (2024) 602 U.S. 821, 834 ["[v]irtually 'any fact' that ' "increase[s] the prescribed range of penalties to which a criminal defendant is exposed" ' must be resolved by a unanimous jury beyond a reasonable doubt ([unless] freely admitted. . .)"].) We accept the People's concession and remand this case for resentencing.

## DISPOSITION

The convictions are affirmed. The sentence is vacated and the case remanded to the trial court for a full resentencing hearing in accordance with this opinion. (See *Wright*, *supra*, 113 Cal.App.5th at p. 848.)

BURNS, J.

WE CONCUR:


SIMONS, ACTING P.J.
CHOU, J.

*P. v. Mattingly (A170673)*

14