Filed 12/20/23  P. v. Silva CA4/1
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>ERNESTO SILVA SILVA,<br><br>   Defendant and Appellant. | D082207<br><br><br>(Super. Ct. No. INF1900889) |

APPEAL from a judgment of the Superior Court of Riverside County, Timothy F. Freer, Judge.  Affirmed.

Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, Arlene A. Sevidal and Susan Elizabeth Miller, Deputy Attorneys General for Plaintiff and Respondent.

A jury convicted Ernesto Silva Silva of two counts of oral copulation of a child 10 years of age or younger (Pen. Code,[1] § 288.7, subd. (b); counts 1, 2)

---

[1]     Undesignated statutory references are to the Penal Code.

and two counts of committing a lewd and lascivious act on a child under the age of 14 (§ 288, subd. (a); counts 3, 4). The trial court sentenced Silva to two consecutive terms of 15 years to life in prison for counts 1 and 2, and imposed but stayed 6-year midterms on counts 3 and 4 under section 654. Silva contends: (1) the court prejudicially erred and violated his rights to due process by admitting expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS); (2) the court violated his Sixth and Fourteenth Amendment rights to due process and a fair trial by improperly instructing the jury with CALCRIM No. 1193; (3) the court failed to exercise its newly created sentencing discretion under section 654 as amended by Assembly Bill No. 518; and (4) his 30-year-to-life sentence, which he claims is de facto life without parole, is constitutionally excessive. We reject the contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Silva does not challenge the sufficiency of the evidence of his convictions, so we briefly summarize the underlying facts. When Doe was in about fifth grade, she began living in an apartment with her mother and her mother's boyfriend, Silva, as well as three of Doe's siblings. For a time before that, Doe had been in foster care. At the apartment, Doe's mother and Silva slept on a bed inside a walk-in closet, where at times Silva let Doe use his phone to play games. A few months after Doe moved in, on two different occasions a few days apart, Silva approached Doe while she was playing with his phone and began rubbing her back; he then touched her breasts under her shirt, and also rubbed her behind with his hands. Silva pulled Doe's shorts and underwear down, rubbed his hand on her vagina, then orally copulated her. The second time, the closet door was open. Silva's daughter saw what Silva was doing to Doe and screamed for her to leave the closet. At the time

2

of these incidents, only Doe's siblings were in the house. Doe was about nine or 10 years old when the abuse occurred.

Doe did not tell anyone about the incidents because she was scared no one would believe her, and because she did not want to return to foster care. When Doe was 14 years old, she disclosed the incidents to a social worker, Denise Bowman, telling Bowman Silva orally copulated her twice. At trial, the court permitted the jury to view a video of the forensic interview. The transcript shows that Doe initially denied the incidents or being touched by anyone, but eventually described what happened by writing on a piece of paper.

At trial, the prosecution presented testimony from Bowman. She discussed her experience working with children where there were allegations of sexual abuse, and particularly Doe's interview. Bowman generally explained that some children were not ready to talk about what happened to them: "It just depends on so many factors that are going on in the family dynamics and them inside internally, fear, shame, inability to process the trauma of the abuse, may not have an understanding, depending on the age of the child. They may not even know what happened or what that means. [¶] So we do have children that don't disclose." The prosecutor asked her if she experienced instances where a child denies abuse, but then later discloses it in the same interview: "[W]e call it 'delayed disclosure,' but typically delayed disclosure is when kids take a minute [*sic*], months, weeks to talk about what happened. If you look at—someone took the research regarding disclosure. Many people do not tell about abuse when they're children, and they know that by interviewing adults and adults saying, 'I never told anybody.' So we know that disclosure is something that we have to contend with in interviews, and the delayed disclosure of children or reluctancy to

3

tell, so we just have to wait it out." Bowman explained that fear was the number one element leading to delayed disclosure, and that the abuser being a family member can impact the child's decision. She related that she asked Doe why she had not said anything before, and Doe responded that she did not want to be separated again.

Silva called his daughter as a witness. In part, she denied seeing any inappropriate touching between Silva and any of the children. However, she admitted that she had initially answered yes to an investigator's question whether Doe was ever alone with her father, telling him that Doe had entered the closet with her father, but only when he was asleep. Silva's daughter retracted that answer a few days later, telling the investigator that Doe never went into the closet with Silva.

DISCUSSION

I. <em>CSAAS Expert Testimony</em>

A. *Background*

Before trial, the court heard the parties' arguments as to admission of testimony about CSAAS via the prosecution's expert, clinical and forensic psychologist Jody Ward. Defense counsel argued under Evidence Code section 352 the CSAAS testimony was irrelevant and lacked foundation; that jurors no longer operated under misconceptions about sex abuse victims' delayed reporting, recantations or denials, and jurors would be more prone to misuse the information and "work[ ] backward" to conclude that because a person had certain attributes, she must be an abuse victim. He pointed out that in jury selection, no juror had misconceptions or expressed concern about delayed reporting by victims.

The prosecutor stated that the main thrust of Dr. Ward's testimony would be about why a child would delay reporting abuse. He argued CSAAS

4

was not within the general knowledge of persons in the community, and still required expert testimony.

The court admitted Dr. Ward's CSAAS testimony, finding "potentially many jurors have never even come close to dealing with this subject matter, may not be aware or understand or fully grasp the reactions of individuals who have survived child abuse sexual assault." It stated the evidence was "highly probative to explain the conduct of the complaining witness or victim in the case and why their act might not be something that a juror would expect. It might be inconsistent with what someone would believe to be, quote, unquote, 'a normal reaction' or inconsistent with their own beliefs on that subject matter." The court ruled that the evidence was relevant, that its relevance outweighed any prejudicial effect, and that there were sufficient safeguards in place so as to avoid misconceptions about how to use the CSAAS instruction for that testimony. Defense counsel then asked the court to pre-read the related CSAAS jury instruction, CALCRIM No. 1193: "Would the court consider reading that jury instruction before [Dr.] Ward testifies in this case?" The court agreed to counsel's request and read the instruction before she gave her testimony as follows: "You will hear testimony from Dr. . . . Ward regarding child sexual abuse accommodation syndrome. Dr. Ward's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not . . . Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

Thereafter, Dr. Ward gave her opinion generally on "how children respond to sex abuse that occurs within an ongoing relationship as a whole." She stated she did not review materials or evidence relating to Silva's case or

5

Doe, and explained she was not opining on whether Doe was telling the truth or Silva committed the crime. Dr. Ward testified that CSAAS is a "pattern of behaviors" that many, but not all, children who have been sexually abused exhibit; that "[m]any times these behaviors are counterintuitive or not what we would expect." According to Dr. Ward, when it is known that a child has been sexually abused, then "these patterns of behaviors kind of make sense in terms of the way a child copes with that sexual abuse." She explained the syndrome was not a disease or disorder, nor a tool to determine whether a child has been sexually abused. Dr. Ward testified that children who were abused by someone well known to them respond differently than children abused by a stranger: "[C]hildren who have been abused within an ongoing relationship, out of loyalty and love for the abuser, tend to not report that abuse right away. When they do report it, they tend, unfortunately, not to be believed, because, again, it doesn't fit our idea of how sexual abuse should happen. And because they're not believed, they do not receive as much support and help that they need to recover from that sexual abuse." Dr. Ward also discussed the five components of CSAAS: (1) secrecy; (2) helplessness; (3) entrapment or accommodation; (4) delayed, unconvincing disclosure; and (5) recantation or retraction. In part, she explained that children tend to keep sexual abuse secret for a very long period of time, even without a typical threat. She also explained that most children delay their disclosure of abuse until a time when they feel safe or less helpless; studies showed that two-thirds of children waited until adulthood to report. According to Dr. Ward, even when the child reports as an adult, the disclosure could be "tentative and hesitant and could come across as very unconvincing."

6

The court again instructed the jury with CALCRIM No. 1193 as follows: "You have heard testimony from Dr. Jody Ward about [CSAAS]. [¶] Dr. Ward's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding . . . whether or not [ ] Doe's conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."

During closing arguments, the prosecutor explained that three of the components of CSAAS—secrecy, helplessness, and delayed disclosure—"fit nicely within our fact pattern here in this case." He stated: "In this case, you saw what can be described as a textbook example of a child exhibiting some of the patterns and traits of child sexual abuse accommodation. There was a long time in delaying of reporting. There was a concern about secrecy. There was a concern of helplessness and what happens next. [¶] In this case, the little girl couldn't or wouldn't talk for so long. She didn't want to tell anybody. But in this case, the evidence speaks volumes. The evidence in this case screams guilty. The corroboration that to the un—the naked eye—to the untrained eye screams, beyond a reasonable doubt, that man over there, that defendant there did these things to [Doe]. [¶] When you consider the context of her disclosure, both in the forensic interview and as she sat there, ask yourselves, why would that little girl sit on that couch, make that disclosure and cry and weep and write out what happened to her if it weren't true? [¶] Why would she come all this way, sit in that chair, and in a room full of strangers, detail the most intimate and most disturbing thing that's ever happened to her in her young life unless it were true?" He concluded, "In this case, ladies and gentlemen, it is the evidence that does the speaking. It is the evidence that does the talking. And it is the evidence that will guide you to

7

convict that man of all four counts beyond any reasonable doubt. [¶] The word 'evidence' in this case screams guilty."

In his closing argument, defense counsel began by telling the jury they were "here to decide if it happened . . . ." He addressed the burden of proof, pointing out that the prosecution bore it, and Silva did not need to prove his innocence: "Because in a case like this, or other cases with a long delay, with unspecified charges for when they happened, sometimes the most someone can do is say, 'Hey, I didn't do it. I don't know what to tell you, but I did not do this.' And you don't have to hear from Mr. Silva on the stand saying that. You know he's saying he didn't do it. That's why we're here, all right? He pled not guilty and that's why we're having this trial, because he denied these charges." Defense counsel explained that the reason he was addressing the burden was that he suggested the contrary in his opening statement: "[In o]pening, I got up and I said, 'Hey, lack of opportunity. There's no way that there's—that [Doe] could have been in that room. It's impossible. There's going to be evidence showing that there's no way this could have happened'; right? And, that didn't happen." Counsel explained to the jury that Silva did not have the burden to prove Doe was never in the room, but the People had to prove she was in the closet where it happened, and that it happened beyond a reasonable doubt.

Defense counsel went on: "Based on the six-year delay—now 10 years—based on the lack of corroborating evidence, based on the suspicious timing of the allegation, at most what we can say in this case is there's not enough evidence to say what happened. Maybe something happened, possibly, but not to the point where we can convict someone of these charges, not to the point where we can convict Mr. Silva of doing what [the prosecutor] has alleged that he did. [¶] And the most concerning part we have in this

8

case is the timing of the allegations. And I'm not just talking about the delay, but the reason for the delay and the timing of when the allegations came up and why they came up when they did." Defense counsel stated that given the event happened so long ago, "[w]e don't expect physical evidence in this case, DNA, witnesses remembering things. . . . So if someone is going to make something up, that's a lot harder to disprove if they say it happened a long time ago. So the delay in itself is not credibility—it doesn't go to credibility."

Defense counsel asked the jury to think about whether there was a "not so innocent reason" why the allegations came out so late, and proposed that Doe's older sisters influenced Doe negatively against Silva, and shortly afterwards Child Protective Services received an anonymous report. "That can't be discounted. The timing of that is too suspicious to just toss away. So while the delay in itself may not be suspicious, the timing of when these allegations came out are." He told the jurors they could consider "a few pretty big inconsistencies between [Doe's] 2018 interview and her 2022 testimony."

B. *Contentions*

Silva contends Dr. Ward's testimony was irrelevant and inadmissible under Evidence Code section 801 as it was not relevant to any disputed fact, nor was it sufficiently beyond the common experience of a lay juror. He asserts neither the court nor the prosecutor rebutted his counsel's statement that no misconceptions emerged from any juror during voir dire, and he characterizes the court's ruling as a "highly speculative musing" that is without support by evidence or by statements from the jurors. Silva asserts his counsel did not rely on misconceptions or use Doe's delayed disclosure to attack her credibility, but instead argued her delayed disclosure did not go to credibility. According to Silva, the prosecution did not meet its burden to

9

demonstrate a need for the evidence to clear up some jury confusion caused by the facts of the case or their understanding of typical victim behavior.

C. *Legal Principles and Standard of Review*

"No evidence is admissible except relevant evidence." (Evid. Code, § 350; see *People v. Hardy* (2018) 5 Cal.5th 56, 87.) " ' "Relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' " ' " (*People v. Govan* (2023) 91 Cal.App.5th 1015, 1030; see also *Hardy*, at p. 87.) Under Evidence Code section 352, the court "in its discretion" may exclude otherwise admissible evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In weighing probative value and prejudice, courts consider the unique facts and issues of each case, not a "mechanical application of automatic rules." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 174.) Evidence only creates "undue prejudice" if it tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the particular case. (*Ibid.*; *People v. Megown* (2018) 28 Cal.App.5th 157, 164.)

" 'The requirements for expert testimony are that it relate to a subject sufficiently beyond common experience as to assist the trier of fact and be based on matter that is reasonably relied upon by an expert in forming an opinion on the subject to which his or her testimony relates.' " (*People v. Polk*

10

(2019) 36 Cal.App.5th 340, 353; see Evid. Code, § 801.[2]) " 'The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men [or women] of ordinary education could reach a conclusion as intelligently as the witness." ' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299-1300.)

" 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.' " (*People v. Brown* (2014) 59 Cal.4th 86, 101; *People v. Sedano* (2023) 88 Cal.App.5th 474, 479.) Under this standard, "[a] trial court's decision to admit or exclude evidence . . . will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.) This same review standard applies to the court's relevance determination. (*People v. Hardy*, *supra*, 5 Cal.5th at p. 87; *People v. Caparaz* (2022) 80 Cal.App.5th 669, 683.)

---

[2]    Evidence Code section 801, subdivision (b) allows an expert to testify "Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

As for CSAAS expert testimony, it "has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' " (*People v. Sedano*, *supra*, 88 Cal.App.5th at p. 479, quoting *People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 171; see also *People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.) CSAAS testimony is permitted " ' "to explain the emotional antecedents of abused children's seemingly self-impeaching behavior," ' such as delayed disclosure of the abuse." (*Sedano*, at p. 479.) "An expert's explanation of CSAAS 'is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' " (*Ibid*.) But a CSAAS expert may not generally testify about the components of the syndrome in such a way as to allow the jury to apply it to the facts of the case and conclude the child was sexually abused. (*Id*. at p. 480.)

D. *Analysis*

   1. *The CSAAS Evidence Was Relevant*

   It is evident from defense counsel's recounting of his opening statement and his closing arguments, as well as his examination of Silva's daughter, that a main issue for the jury was Doe's credibility. That defense counsel did not directly attack Doe's credibility on the basis of her delayed disclosure is not necessary. As long as Doe's credibility was an issue of consequence to the action, evidence that had a tendency in reason to prove or disprove it was relevant. Dr. Ward's testimony that children who have been sexually abused tend to delay their disclosure, as Doe did here, tended to bolster the credibility of her testimony about Silva's abuse, which she testified had

12

occurred years earlier. The court framed its ruling of probative value in terms of "explain[ing] the conduct of the complaining witness or victim . . . and why their act might not be something that a juror would expect," but we see no distinction between that framing and the question of Doe's credibility or believability.

We hold the court's decision as to the relevance of the CSAAS evidence was reasonable, not arbitrary, capricious or absurd. As the court in *People v. Lapenias* aptly put it: "The [trial] court made a reasoned judgment that the probative value of the proffered CSAAS evidence was substantially outweighed by any prejudicial effect. (See [Evid. Code,] § 352.) Prior to its evidentiary ruling, the prosecutor informed the court about the anticipated evidence . . . . The court plainly did not approach its ruling in an arbitrary or capricious manner. Thus, we find no abuse of discretion." (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 174.) We do not reach the question of prejudice or harmless error.[3]

Under the circumstances, we reject Silva's claim that the CSAAS evidence violated his Sixth and Fourteenth Amendment rights to due process. "Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process. [Citation.] Further, reviewing courts have routinely held the admission of CSAAS evidence does not violate due process." (*People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 174.)

---

[3] That Bowman also testified about delayed disclosure and other reactions of child sex abuse interviewees would tend to show any supposed error in admitting CSAAS evidence was harmless in any event.

13

2. *The Evidence Was Properly Admitted Under Evidence Code Section 801*

We reach the same conclusion as to the court's decision to admit the CSAAS expert evidence under Evidence Code section 801. Dr. Ward explained that children who are victims of sexual abuse exhibit behaviors that are counterintuitive or unexpected, and CSAAS helped adults or laypeople to understand "why children do what they do in response to sexual abuse that occurs within an ongoing relationship." That the jurors may have not expressed having such misconceptions does not mean the evidence would not help them in assessing Doe's behavior, and understanding her delayed reporting. The trial court reasonably concluded that while some issues might be within the purview of jurors' knowledge, many may not "fully grasp" the reactions of child sexual abuse survivors, and thus expert testimony regarding CSAAS would assist the jurors (Evid. Code, § 801, subd. (a)), even if they were not completely ignorant of the subject matter. (*People v. McAlpin, supra,* 53 Cal.3d at p. 1299.) We hold the court did not manifestly abuse its broad discretion in admitting the evidence; its decision was not arbitrary or wholly unreasonable.

II. *Instruction with CALCRIM No. 1193*

Silva further contends that the court's instruction with CALCRIM No. 1193 violated his rights to due process and a fair trial because the instruction made it reasonably likely the jury would use CSAAS evidence to determine whether Doe's story was true. He asserts CSAAS testimony is to be admitted only for a limited purpose, that is, to rehabilitate a child witness's credibility when the defendant suggests his or her conduct is inconsistent with their testimony about molestation, but that the second part of CALCRIM No. 1193 results in a "logical inconsistency" that specifically authorized use of CSAAS

14

as evidence of guilt. More specifically, Silva maintains under the facts presented in his case, the two statements in CALCRIM No. 1193 are irreconcilable: "When, as here, a witness's account is the *only evidence* the defendant committed the charged offenses, it is not possible to use testimony to evaluate her believability, and simultaneously *not* use the testimony as evidence that the defendant committed those offenses." He maintains the double negative phrase "not inconsistent with" permitted the jury to use the CSAAS evidence "as a diagnostic tool, by concluding that because Doe's conduct was 'consistent with' those of sexual abuse victims, her claims were true."

Silva further contends the instruction is argumentative in that it "expressly permits jurors to use CSAAS evidence to determine if the complainant's behavior is *consistent* with that of a sexual abuse victim, but ignores the inference that the s*ame behavior might suggest falsity*. Without the instruction, a juror might—and properly would—consider whether Doe['s] delayed reporting, inconsistent and implausible stories, in conjunction with [Silva's daughter's] denial that she witnessed one of the incidents, supported an inference that [Doe] was confabulating her claims. But CALCRIM No. 1193 says nothing about this possible inference. Nor does it offer jurors the option of *rejecting* CSAAS's explanation for a witness's conduct."

The People contend in response that Silva forfeited the error by failing to object to the use of CALCRIM No 1193. Silva's counsel, however, did not just omit an objection; he requested that the court give the instruction without modification or clarification. This affirmative request invited the error. The "doctrine of invited error bars [an appellant] from challenging a jury instruction given by the trial court when the [appellant] has requested the instruction based on a ' " ' "conscious and deliberate tactical choice." ' " ' "

15

(*People v. DeHoyos* (2013) 57 Cal.4th 79, 138; *People v. Lucero* (2000) 23 Cal.4th 692, 723-724.)  The doctrine " ' " applies 'with particular force in the area of jury instructions . . . .' " ' " (*People v. Mason* (2013) 218 Cal.App.4th 818, 823; see also *Regalado v. Callaghan* (2016) 3 Cal.App.5th 582, 592.)  We agree with the People that Silva may not acquiesce in the instruction then claim on appeal that as read it was improper, inadequate, or incomplete. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901 ["Because defendant did not object at trial that the instructions were incomplete as given, the issue is forfeited"]; *People v. Lee* (2011) 51 Cal.4th 620, 638 [a defendant believing an instruction requires elaboration or clarification is obliged to request such elaboration or clarification in the trial court].)

Even if we were to consider Silva's challenge, we would reject it on our de novo review.  (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)  In assessing a jury instruction challenge we consider the instruction at issue " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid*.; see also *People v. Lemcke* (2021) 11 Cal.5th 644, 655.)  We " 'presume [jurors] generally understand and follow the court's instructions.' " (*People v. Wilson* (2023) 89 Cal.App.5th 1006, 1014; see also *People v. Buenrostro* (2018) 6 Cal.5th 367, 431.)

Silva concedes that appellate courts considering challenges to CALCRIM No. 1193 have upheld it as a correct statement of the law and the limitations on the use of CSAAS testimony.  (See *People v. Lapenias*, *supra*, 67 Cal.App.5th at p. 175.)  *Lapenias* observed that courts have held the instruction "does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof." (*Ibid*., citing *People v. Gonzales* (2017) 16

Cal.App.5th 494, 503-504 & *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474.)

But Silva maintains none of the cases address logical inconsistency, which he says is the "most problematic aspect" of CALCRIM No. 1193. Silva argues: "If the evidence can allow the jury to conclude that the complaining witness did not lie when she said she was abused, then it means *her allegations are true*." He also asserts that in *People v. Gonzales, supra,* 16 Cal.App.5th 494 and *People v. Munch*, *supra,* 52 Cal.App.5th 464 there was corroborating evidence so that the jury was not relying exclusively on the complaining witness's credibility, and neither case addressed the instruction's assertedly argumentative nature. Silva is incorrect. *Gonzales* involved testimony from the same CSAAS expert who testified in his case, Dr. Ward. (*People v. Gonzales*, *supra*, 16 Cal.App.5th at p. 499.) In that case, the court expressly addressed the defendant's claim that the instruction was "inconsistent" in that it "states that the CSAAS testimony is not evidence the defendant committed the charged crimes, and also that the jury may use the evidence in evaluating the believability of [the victim's] testimony." (*Gonzales*, at p. 503.) This is Silva's claim. The *Gonzales* court rejected the defendant's argument that it was "impossible to use the CSAAS testimony to evaluate the believability of [the victim's] testimony without using it as proof that Gonzales committed the charged crimes." (*Ibid*.) The court reasoned the instruction "must be understood in the context of Ward's testimony. Ward testified that CSAAS is not a tool to help diagnose whether a child has actually been abused. She said that if it is not known whether a child has been abused, CSAAS is not helpful in determining whether a child has, in fact, been abused. The purpose of CSAAS is to understand a child's reactions when they have been abused. [¶] A reasonable juror would understand

17

CALCRIM No. 1193 to mean that the jury can use Ward's testimony to conclude that [the victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use Ward's testimony to conclude [the victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes Ward's testimony will find both that [the victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Gonzales*, at pp. 503-504.) Dr. Ward testified similarly here.[4]

As for Silva's claim that *Gonzales* and the other cases are distinguishable given corroborating evidence, that went to the question of prejudice or whether the error in giving the instruction was harmless. (See *People v. Gonzales*, *supra*, 16 Cal.App.5th at pp. 502-503, 504.) We find no error in the instruction, so we do not reach the prejudice question.

We reject Silva's claim that the instruction is also argumentative. An instruction is argumentative when it is " ' "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." ' " (*People v. Woods* (2015) 241 Cal.App.4th 461, 488, in part citing

---

4    Dr. Ward testified: "[CSAAS] is what we would call a nondiagnostic syndrome. A syndrome is, in this case, a pattern of behaviors or group of symptoms that are thought to come from a certain cause, but we can't necessarily prove that they come from that cause. [¶] So in this case, we can't prove that child—these behaviors involved in child sexual abuse accommodation come from sexual abuse because there is no way for me to know for sure whether a child was sexually abused. [¶] But when we do know that a child has been sexually abused, then these—these patterns of behaviors kind of make sense in terms of the way a child copes with that sexual abuse. But it's not a disease or disorder. It's not a tool that tells us whether or not a child has been sexually abused."

*People v. Wright* (1988) 45 Cal.3d 1126, 1135 [an argumentative instruction "invite[s] the jury to draw inferences favorable to [a party] from specified items of evidence on a disputed question of fact, and therefore properly belongs . . . in the arguments of counsel to the jury"].)  We disagree the instruction invited the jury to draw any particular conclusion about the CSAAS evidence or Doe's credibility in the People's favor.  And, viewing CALCRIM No. 1193 in context with the other instructions, it had no such impact.  The jurors were instructed that they were the sole judges of credibility or believability of the witnesses, and they could believe "all, part, or none of any witness' testimony."  (CALCRIM No. 226.)  They were instructed via CALCRIM No. 332 that they were not required to accept expert testimony as true or correct.  The instructions as a whole gave the jury the option to disbelieve Doe as well as Dr. Ward regardless of the CSAAS evidence.  We presume the jury followed them.  In sum, the trial court did not err or violate Silva's constitutional rights by instructing the jury with CALCRIM No. 1193.

III.  *Section 654 Sentencing Discretion*

A.  *Background*

The trial court sentenced Silva in June 2022, after the January 1, 2022 effective date of section 654's amendment by Assembly Bill No. 518 (2021-

2022 Reg. Sess.).[5] During the sentencing hearing, the People asked the court to sentence Silva to consecutive life terms on counts 1 and 2 given that the crimes had occurred on two separate days. Silva's counsel argued the court had discretion to run the terms concurrently, and asked the court to do so given Silva's lack of criminal record, his supporting letters, and the trial evidence. He had previously advised the court in a sentencing brief that under amended section 654, it had discretion to impose a "tailored sentence that fits the facts and circumstances of this case instead of just imposing a 30[-year-]to[-]life sentence. Defense counsel proposed the court stay the punishment on either both or one of the indeterminate counts 1 and 2 and sentence Silva under counts 3 and 4, or to one indeterminate and one determinate term.

The court proceeded to sentence Silva, finding him ineligible for probation based on the nature of the charges. It imposed the two consecutive

---

[5] Before its amendment by Assembly Bill No. 518, section 654 provided in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).) Assembly Bill No. 518 amended section 654 to provide in part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "Previously, where . . . section 654 applied, the sentencing court was required to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term. (. . . § 654, former subd. (a).) As amended by [Assembly Bill No.] 518, . . . section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

indeterminate terms of 15 years to life for counts 1 and 2. In doing so, the court expressly stated that "recognizing the discretion it has," it "[did] not view in this particular situation it would be appropriate to run [counts 1 and 2] concurrent."[6] The court imposed the six-year midterms on counts 3 and 4, which it stayed under section 654, finding they arose out of the same circumstances and transactions of counts 1 and 2. The trial court did not mention Assembly Bill No. 518 or acknowledge section 654's January 2022 amendment.

B. *Contentions*

Asserting that the sentencing hearing transcript indicates the court did not mention or understand its discretion under newly amended section 654, Silva now contends the matter should be remanded for the court to exercise its discretion at a new sentencing hearing. He asserts: "Whereas the court

---

[6] The court stated that, considering the totality of the trial evidence, it was convinced beyond a reasonable doubt that there were two separate and distinct individual acts. It stated in part: "I think also what warrants commenting was that although it's not necessarily a fact that's been pled and proved that would typically occur in the type of situation where the court has to select . . . a base term, lower term, or upper term, it was clear to the court that one of the reasons why the court is considering and is going to impose consecutive terms is the position of trust that was occupied in this particular case. [¶] . . . [¶] And for the purpose of this case and what I've heard, this court believes it's appropriate to run consecutive sentences. The court took note of that and took note that [Silva] took advantage, if you will, of the familial situation and acted as a predator in that instance, because it's true there were many individuals that were running around, many children, a blended family in a small apartment. [¶] . . . [¶] When I heard the testimony of the victim in this case, it's consistent with someone that took advantage of that situation, took advantage of the mother's desperation to reunify with her children to put herself in a situation, and he further took advantage of situation [*sic*] knowing that the children weren't paying attention for his sexual needs and sexual pleasure. [¶] I was convinced there were two separate acts that distinctly occurred."

21

explicitly acknowledged its discretion to impose concurrent or consecutive terms on counts 1 and 2 and explained its decision, it made no mention of its discretion pursuant to [Assembly Bill No.] 518." He finds "telling" the court's comments about Silva's position of trust (see footnote 6, *ante*), stating it shows the court "failed to recognize that this was a case where it *could* be selecting from a determinate sentencing triad *if it elected to impose sentence on counts 3 and 4*." According to Silva, remand for resentencing is not futile, given his nonexistent criminal history, low risk for reoffending, and the court's "broad range of discretion in which it could have imposed anywhere from 5 to 16 years of a determinate term."

The People respond that section 1203.065, subdivision (a) prohibits the court from staying execution of sentence for the counts 1 and 2 section 288.7 convictions. They rely on *People v. Caparaz* (2022) 80 Cal.App.5th 669, 689 (*Caparaz*), in which the People similarly argued against a remand for resentencing in light of Assembly Bill No. 518's amendment to section 654 on grounds the court lacked discretion to stay the punishment there mandated by the "One Strike" law. (*Id.* at pp. 688-689.) The *Caparaz* court agreed, holding section 667.61, subdivision (h)[7] meant that a court has no discretion to suspend or stay a one strike sentence in favor of a shorter non-one strike

_____

[7] Section 667.61, subdivision (h), the provision at issue in *People v. Caparaz, supra*, 80 Cal.App.5th 669 provides: "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section." Section 1203.065, entitled "Probation and suspension of sentence prohibited for certain sex offenses," similarly provides in part: "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is convicted of violating . . . Section 288.7 [engaging in sexual penetration with a child who is 10 years of age or younger] . . . ." (§ 1203.065, subd. (a).)

sentence notwithstanding section 654.  (*Id*. at pp. 689-690.)  *Caparaz* reasoned in part that "a stay is [a] type of suspension; thus, a prohibition against suspending a sentence necessarily prohibits the stay of a sentence." (*Id*. at p. 689.)  The *Caparaz* court rejected the defendant's interpretation of the statute, construing section 667.61, subdivision (h) so as to not render the phrase "nor shall the execution or imposition of sentence be suspended for" meaningless.  (*Ibid*.)

C.  People v. Govan

A division of the Second District Court of Appeal has disagreed with *Caparaz*.  (*People v. Govan, supra*, 91 Cal.App.5th at p. 1020.)  *Govan* interpreted section 667.61, subdivision (h) differently:  "Reasonably read, section 667.61, subdivision (h), prohibits only probation and not a stay under section 654.  The language in subdivision (h) is unique to a grant of probation.  Moreover, section 667.61, subdivision (h), is intended to increase the punishment for forcible sex offenses, whereas section 654 is intended to ensure the punishment for an offense is commensurate with a defendant's culpability where two crimes arise from a single, indivisible course of conduct."  (*Ibid*.)  The Court of Appeal acknowledged that a section 654 stay has the effect of suspending a sentence until a specific contingency, but found it "[did] not follow that the Legislature's use of the precise language 'nor shall execution or imposition of sentence be suspended' in section 667.61, subdivision (h), was intended to bar a stay of a sentence under section 654, which uses different language and serves a separate purpose."  (*Govan,* at pp. 1032-1033.)  *Govan* also examined legislative history of the One Strike law, and concluded in part it showed the Legislature sought to prohibit trial courts from placing one-strike offenders on probation, not to extend the section's reach to bar other forms of suspended sentences.  (*Id*. at p. 1033.)

23

*Govan* held that because the One Strike law did not divest the court of discretion under section 654 to stay the defendant's sentence, he was entitled to resentencing under amended section 654, which applied retroactively to his nonfinal judgment. (*Id*. at pp. 1020, 1031, 1035.)

We do not need to resolve whether we agree with *Govan* or *Caparaz*. If we were to agree with the People and *Caparaz*, remand is not warranted. But if we were to agree with Silva, we would likewise conclude remand is not warranted. Assuming the court had discretion to apply amended section 654, the record here does not rebut the appellate presumption that the court understood that discretion. Silva cannot demonstrate affirmatively that the court misunderstood it.

D. *Remand for Resentencing Is Not Required on this Record*

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, . . . the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; see also *People v. Lee* (2017) 16 Cal.App.5th 861, 866.) But remand is not necessary if the trial court was aware of its sentencing discretion or "if the record is silent concerning whether the trial court misunderstood its sentencing discretion. Error may not be presumed from a silent record." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228-1229; see also *Lee*, at p. 867.)

24

Rather, "[i]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.' " (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) "Isolated or ambiguous remarks by the trial court do not overcome that presumption." (*People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 835.) These principles apply to the court's sentencing decisions. (See *People v. Mosley* (1997) 53 Cal.App.4th 489, 496-497 [presumption of correctness of court's decision and regularity of judicial exercises of discretion apply to sentencing issues].)

It is Silva's burden " 'to clearly show that the [court's] sentencing decision was irrational or arbitrary;' " to do so he must " 'affirmatively demonstrate that the trial court misunderstood its sentencing discretion.' " (*People v. Lee*, *supra*, 16 Cal.App.5th at p. 866.)

Silva cannot meet this burden. The court had before it Silva's counsel's written arguments and position as to how it could apply recently-amended section 654 to his sentence. The court did not acknowledge those papers, but that is of no moment as we must presume in the face of the silent record that it read and considered them. (Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"]; accord, *People v. Black* (2007) 41 Cal.4th 799, 818, fn. 7 ["The trial court is presumed to have read and considered the probation report"], overruled on other grounds by *Cunningham v. California* (2007) 549 U.S. 270, 292.) Nor did the court mention Assembly Bill No. 518 or refer to the amendments to section 654, but again, a silent record requires that we presume the court understood its discretion under the new law.

We disagree with Silva that the court's remarks during sentencing indicated it misunderstood or failed to appreciate its new-found section 654 sentencing discretion. That the court mentioned its discretion with respect to

running terms concurrently or consecutively, or referred to the determinate sentencing triad, does not mean it failed to recognize its discretion in other respects or that the new law "escaped the court's notice." To reach that conclusion would require us to draw an inference that the court did not read the papers before it, ignoring the required presumptions of correctness and properly performed judicial duty.

IV. *Claim of Constitutionally Excessive Sentence*

Pointing out he is 55 years old with no prior criminal history and a below average re-offense risk score, Silva contends his 30-year-to-life without parole sentence is constitutionally excessive because it "ensured his earliest parole eligibility exceeds his actuarial life expectancy." He maintains his challenge may be raised even though he did not object below on grounds of cruel and/or unusual punishment as this court has discretion to address it; it implicates fundamental constitutional rights as well as his substantial rights, permitting review under section 1259; and it is a pure question of law based on undisputed facts before this court.

A. *Forfeiture*

The People argue Silva forfeited any cruel and unusual punishment challenge by not objecting to his total sentence on that ground below. They do not address Silva's reasons why the claim should survive or be exempt from forfeiture. We agree the forfeiture rule applies to claims based on violations of fundamental constitutional rights (*In re Seaton* (2004) 34 Cal.4th 193, 197-198) and specifically "in the context of sentencing . . . ." (*In re Sheena K.* (2007) 40 Cal.4th 875, 881.) Appellate courts acknowledge forfeiture applies where a defendant fails to contemporaneously object in the lower court that his sentence constitutes cruel and unusual punishment,

26

because the issue "often requires a fact-bound inquiry." (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247.)

Here, however, there appear to be no conflicting facts concerning Silva's prior criminal history or personal characteristics. (Compare *People v. Russell* (2010) 187 Cal.App.4th 981, 993 [cruel and unusual punishment claim "should have been raised in the trial court where the trial judge, having heard all of the evidence, would be in a position to assess the validity of [defendant's] claims for [mental] impairment and make assessments as to their impact, if any, on the constitutionality of the sentence in this case"].) Given the absence of disputed facts, the issue would appear to be a question of law subject to our independent review. (Accord, *People v. Wilson* (2020) 56 Cal.App.5th 128, 166-167 [" 'Whether a punishment is cruel and/or unusual is a question of law subject to our independent review, but underlying disputed facts must be viewed in the light most favorable to the judgment' "].) We would in any event exercise our discretion to address the claim, if just to forestall a claim of constitutionally deficient representation. (See *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126; see also *People v. Demirdjian* (2006) 144 Cal.App.4th 10, 14 ["appellant's forfeiture [by failing to make a cruel and/or unusual punishment objection], if his inaction amounted to that, does not preclude an appellate court from reaching the issue"].)

B. *Legal Principles*

The Eighth Amendment to the federal Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.) It is firmly established that " '[t]he concept of proportionality is central to the Eighth Amendment . . . .' " (*In re Coley* (2012) 55 Cal.4th 524, 538.) The Eighth Amendment " ' "does not require strict proportionality between crime and

sentence" but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." ' " (*People v. Baker* (2018) 20 Cal.App.5th 711, 732.) The California Constitution similarly provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." (Cal. Const., art. I, § 17.)

To decide whether a sentence is grossly disproportionate to a crime under the Eighth Amendment, a court " 'begin[s] by comparing the gravity of the offense and the severity of the sentence. [Citation.] "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions. [Citation.] If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.' " (*In re Coley*, *supra*, 55 Cal.4th at p. 542.) In a noncapital context as here, successful Eighth Amendment challenges are " 'exceedingly rare.' " (*Ewing v. California* (2003) 538 U.S. 11, 21; see also *People v. Wilson*, *supra*, 56 Cal.App.5th at p. 167.)

"Under the California Constitution, we use a three-pronged test to determine whether a particular sentence is disproportionate to the offense for which it is imposed. First, we examine 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.' [Citation.] Second, we compare the punishment imposed with punishments prescribed by California law for more serious offenses. [Citation.] Third, we compare the punishment imposed with punishments prescribed by other jurisdictions for the same offense." (*People v. Em* (2009) 171 Cal.App.4th 964, 972; see also *People v. Wilson*, *supra*, 56 Cal.App.5th at

pp. 167-168.)  A lengthy sentence is cruel and unusual under the California Constitution if " 'it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*Wilson*, at p. 167.)

Thus, under both the federal and the state frameworks, we consider the gravity or nature of the offense, but under the federal inquiry, we proceed to the comparative analysis only if the " ' "threshold" ' " analysis concerning the gravity of the offense " ' "leads to an inference of gross disproportionality . . . ." ' " (*In re Coley*, *supra*, 55 Cal.4th at p. 542.)

## C.  *Silva Has Not Demonstrated His Sentence Is Cruel and/or Unusual*

Silva does not engage in a comparative analysis, as he argues application of the first factor alone may suffice to show constitutional disproportionality.  He focuses solely on the nature of his offenses, which he minimizes, and his personal circumstances including his lack of any prior criminal history, combined with an assertion that the 30-year-to-life sentence is a de facto sentence of life-without-parole.

We are not persuaded.  Though Silva concedes his offenses were egregious, he maintains his offenses were not "*especially* egregious" and are on the "lower end of the range of conduct that would violate [section 288.7, prohibiting oral copulation of a child 10 years of age or younger]."  He asserts he did not use force, violence or weapons, nor did he restrain Doe or prevent her from leaving.  He claims Doe suffered no physical injury or pain.  He argues the offenses are commonly committed by a person in a position of trust.  According to Silva, that there were only two instances during the years Doe lived with him suggests his behavior was not deliberate or planned, but brought on by acute stress or alcohol abuse.

29

In *People v. Wilson*, *supra*, 56 Cal.App.5th 128, we rejected the defendant's similar effort to minimize his offenses of oral copulation of a child 10 years or younger, claiming he had minimal culpability as he was an aider and abettor, was not present when one victim committed molestation at his leading, and did not force the sex acts on the victims. (*Id.* at p. 168.) Like Silva does here, the defendant in *Wilson* argued the harm to his victims was minimal. (*Id.* at p. 169.) We likewise reject Silva's contention here. "California courts have long recognized 'a strong public policy to protect children of tender years.' [Citation.] 'Along a spectrum ranging from murder, mayhem, and torture on one end to petty theft on the other, "lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable." ' [Citation.] Rather than decreasing [Silva's] culpability, the vulnerability of [Doe] given [her] young age is an aggravating circumstance." (*Ibid.*) In *Wilson*, we held the defendant's culpability was heightened because he aided his victim to abuse her trusted position as a mother and caregiver so as to assault other children (*ibid.*); here, Silva's acts are more egregious because he used his own position of trust as a boyfriend to Doe's mother to take advantage of Doe.

It is true that Silva has no prior criminal record. But that is not determinative; even someone without a criminal history who commits the crimes Silva committed is a grave danger to society. (See *People v. Gonzales* (2001) 87 Cal.App.4th 1, 17 ["The lack of a significant prior criminal record is not determinative in a cruel and unusual punishment analysis"]; accord, *People v. Gomez* (2018) 30 Cal.App.5th 493, 499-502 [holding constitutional under both the state and federal Constitutions a sentence of 15 years to life on one count of sexual penetration of a child 10 years of age or younger for a defendant with a "very limited criminal record"].) His crimes as Doe

described them were calculated, premeditated, and predatory, committed against a particularly vulnerable victim and stemmed from his abuse of a position of trust. He sexually abused Doe while alone with her in the closet, taking advantage of Doe's desire to use his phone to play games. Doe was only nine or 10 years old, and her mother was not home. Silva was a mature adult in his fifties. Whatever arguably mitigating factors might have been present, they are substantially outweighed by the seriousness of his crimes and the circumstances surrounding their commission.

We end by emphasizing that the cruel and unusual punishment inquiry is undertaken with "great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494; see also *People v. Gomez*, *supra*, 30 Cal.App.5th at p. 499.) This is not such a rare case. The comparison of Silva's crimes with his sentence does not " ' "lead[ ] to an inference of gross disproportionality" ' " (*In re Coley, supra*, 55 Cal.4th at p. 542), and his sentence is not cruel and unusual punishment.

31

## DISPOSITION

The judgment is affirmed.


                                                    O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


KELETY, J.